UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

GUANG JU LIN,

                      Petitioner,

     -against-

UNITED STATES,

                      Respondent.

S3 09-Cr-746 (SHS)
13-Cv-7498 (SHS)

<u>OPINION & ORDER</u>

SIDNEY H. STEIN, U.S. District Judge.

    Guang Ju Lin, currently serving a sentence of life imprisonment for his convictions for racketeering and racketeering conspiracy, has moved pursuant to 28 U.S.C. § 2255 to vacate, set aside, or correct his sentence. The crux of Lin's motion asserts that he was deprived of the effective assistance of counsel because his attorney omitted, at trial and on direct appeal, arguments that Lin perceives as outcome-determinative. In reality, however, the trial record demonstrates that these arguments are meritless. Lin's attorney acted reasonably and did not prejudice his client's case when he did not raise with the Court the arguments that Lin now advances. The Court therefore denies Lin's motion.

## I. BACKGROUND

    In 2009, Lin was charged with a series of violent crimes perpetrated in his leadership role in a gang based in the Chinatown neighborhood of Manhattan. Specifically, he was charged with: (1) racketeering, (2) racketeering conspiracy, and (3) murder in aid of racketeering. (Indictment S3, Dkt. No. 74, returned May 24, 2011.) This Court presided over a three-week jury trial in June and July 2011.

    The evidence at trial revealed that Lin held a leadership position in a Chinatown-based gang—a position variously called "Dai Lo" or "Ah Di"—in which he directed the activities of approximately twenty gang

members. (Liu Tr. 119; *see id.* 121-23, 148-51, 235-36.) According to witnesses who testified at trial, the gang operated several illegal gambling parlors in Chinatown, which Lin either owned or helped operate. (*See, e.g.*, Liu Tr. 319; Yu Tr. 1524; Wittenberg Tr. 1860-64; Li Tr. 1236-37.)

The trial record includes extensive evidence concerning the racketeering acts charged in the indictment. First was the attempted murder of Jian Liu, known as "Jackie," who led a rival Chinatown gang. (Logan Tr. 1445-47; Wittenberg Tr. 1895-98.) An FBI agent testified at trial that Lin confessed his involvement in this November 19, 2001 shooting. (Wittenberg Tr. 1895-1904.) According to Lin's confession, Jackie and his followers had embarrassed Lin and Ah Bo (Lin's fellow gang member) in a series of verbal and physical altercations, after which Lin's superior in the gang ordered him and Ah Bo to pursue Jackie. (*Id.* at 1901-02.) The agent's recounting of Lin's confession revealed that after the gang leader provided handguns to Lin and Ah Bo, the two pursued Jackie to a Chinatown restaurant. (*Id.*) Outside the restaurant, Lin told the FBI agent, the two men aimed their handguns at Jackie while Jackie brandished a knife. (*Id.* at 1902.) Four bullets were fired at Jackie, and Lin said that at least one bullet struck Jackie. (*Id.* at 1902-03.) Lin told the FBI agent that Ah Bo fired all four bullets. (*Id.*) Lin and Ah Bo fled the scene together. (*Id.* at 1903.) A follower of Lin testified at trial that Lin also confessed to him, with the added color that Lin attempted to fire his handgun but his gun jammed and failed to discharge. (Liu Tr. 265-67.)

The trial evidence also linked Lin to the December 11, 2001 murder of Daniel Cabezas. According to witness testimony and a surveillance video, Cabezas bested Lin in a physical altercation while Cabezas was working as a night club security guard. (Yee Tr. 871-73; GX 802.) Shortly afterward, Lin and a fellow gang member "rushed" Cabezas and several of Cabezas's associates (Yee Tr. 873), with Lin's gang colleague stabbing Cabezas to death (*id.; see* Wittenberg 1888-89, 1961, 1974).

2

After the Cabezas murder, Lin fled to Los Angeles where he organized a West Coast extension of his New York gang. (Liu Tr. 160, 406, 419; Yu Tr. 1548-49; Wittenberg Tr. 1918.) The testimony portrayed a flourishing bi-coastal gang of murderous thugs, which, among other crimes, extorted bus and van drivers for protection money in New York City (Liu Tr. 120; Li Tr. 1310), distributed narcotics in New York and California (Liu Tr. 391-97, 550-52), operated illegal gambling parlors in Los Angeles (Liu Tr. 457-75; Lee Tr. 1097-1113), and attempted to rob a restaurant in Los Angeles using a knife and a fake handgun (Liu Tr. 609-16). Gang members testified at Lin's trial that Lin supervised and participated in these activities. (Liu Tr. 120, 513, 550-52, 609-16; Li Tr. 1303-06.)

The gang's activities went beyond the commercial, even extending to murder. According to members of Lin's gang in California, in the weeks preceding the death of another individual—Xui Kang Xiao—a member of Lin's gang named Alex told fellow gang members that Xiao had assaulted Alex and Alex's girlfriend. (Liu Tr. 492-94.) Alex also told fellow gang members that Xiao owed him money from a past insurance fraud they had undertaken together. (Liu Tr. 1707-08.) Fellow gang members testified that four of them, including Lin and Alex, met at Lin's home before driving to Xiao's home at night and entering Xiao's bedroom where he was asleep. (Liu Tr. 494-514; Liu Tr. 1722-23.) The witnesses explained that Xiao awoke and attempted to attack them, whereupon one gang member stabbed him. (Liu Tr. 512; Liu Tr. 1722.) Next, Xiao attempted to flee: as one of the gang members testified, Xiao "tried to get up but [Lin] keep kicking him, keep kicking him. Won't let him get up." (Liu Tr. 512-13.) Xiao eventually stood up and began to run away, at which time Alex shot him. (*Id.* 513-16.)

The jury convicted Lin on Counts One and Two, which charged him with racketeering and racketeering conspiracy. With respect to Count One, the jury found that four charged racketeering acts had been proven beyond a reasonable doubt, namely: (1) the attempted murder of Jackie, (2) operation of illegal gambling enterprises, (3) narcotics trafficking, and (4) the murder of Xiao. It acquitted Lin on Count Three, which charged him

3

with the Cabezas murder. This Court subsequently sentenced Lin to two concurrent life sentences.

Lin filed an appeal to the U.S. Court of Appeals for the Second Circuit. His appellate counsel identified two putative errors by this Court: first, in admitting evidence relating to the Xiao murder and failing to strike the relevant portions of the indictment, and second, in admitting recordings of ten telephone calls Lin made while incarcerated at the Metropolitan Correction Center ("MCC"). *See United States v. Lin*, 505 F. App'x 10, 12 (2d Cir. 2012).

On December 10, 2012, the Second Circuit affirmed Lin's convictions and sentence in a summary order. *Id.* With respect to the inclusion of the Xiao murder in the indictment and at trial, the Court of Appeals noted that the government added the murder to the indictment as a racketeering act "less than one month before the scheduled start of trial," but it concluded that Lin neither made a showing of bad faith nor "attempt[ed] to cure the potential prejudice by moving for a reasonable continuance." *Id.* Accordingly, the court wrote that it could "see no reason . . . that the District Court should have dismissed the relevant portion of the [] Indictment or excluded relevant evidence." *Id.* at 13. With respect to the MCC calls, the Second Circuit determined that Lin's statements were properly admitted as opposing party statements pursuant to Federal Rule of Evidence 801(d)(2)(A) and that this Court did not abuse its discretion when it declined to exclude them as unfairly prejudicial pursuant to Federal Rule of Evidence 403. *Id.* at 13-14.

Lin has now timely moved pro se pursuant to 28 U.S.C. § 2255 to vacate, set aside, or correct his sentence on the grounds of ineffective assistance of counsel at trial and on appeal. (*See* Mot. Under 28 U.S.C. § 2255 to Vacate, Set Aside or Correct Sentence by a Person in Federal Custody, Dkt. No. 1 ("Mot.").) Lin's motion comprises a litany of arguments that he insists his attorney should have pursued.

## II.  LEGAL STANDARDS

To establish ineffective assistance of counsel, a prisoner must demonstrate both that: (1) his counsel's performance was objectively unreasonable under professional standards prevailing at the time, and (2) his counsel's deficient performance resulted in prejudice to his case. *See Strickland v. Washington*, 466 U.S. 668, 587 (1984); *Wilson v. Mazzuca*, 570 F.3d 490, 502 (2d Cir. 2009); *see also Williams v. Taylor*, 529 U.S. 362, 389 (2000) (applying *Strickland* standard to collateral appeal). Under the first prong, a prisoner must establish that his "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed . . . by the Sixth Amendment." *Strickland*, 466 U.S. at 687; *Massillon v. Conway*, 574 F. Supp. 2d 381, 393 (S.D.N.Y. 2008). There is a "strong presumption" that defense counsel's conduct fell within the broad spectrum of reasonable professional assistance. *Kimmelman v. Morrison*, 477 U.S. 365, 381 (1986) (citing *Strickland*, 466 U.S. at 688-89). To satisfy the second prong, the defendant must show that "[t]here is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694; *Massillon*, 574 F. Supp. 2d at 393-94.

In a petition challenging appellate counsel's representation, a prisoner must show that "counsel omitted significant and obvious issues while pursuing issues that were clearly and significantly weaker," *Mayo v. Henderson*, 13 F.3d 528, 533 (2d Cir. 1994), and that "there was a 'reasonable probability that [the omitted claim] would have been successful before the [appellate court]," *id.* at 534 (quoting *Claudio v. Scully*, 982 F.2d 798, 803 (2d Cir. 1992)).

Other than claims of ineffective assistance of counsel, claims for collateral relief "must clear a significantly higher hurdle than would exist on direct appeal." *United States v. Frady*, 456 U.S. 152, 166 (1982). Indeed, if a prisoner forfeited an argument by failing to advance it on direct appeal,

5

then that argument cannot form the basis of a collateral attack. *See, e.g., Campino v. United Staates*, 968 F.2d 187, 190 (2d Cir. 1992).

### III. DISCUSSION

Lin asserts each of his arguments through the prism of an ineffective assistance of counsel claim. If Lin's motion challenged the sufficiency of the evidence rather than his counsel's ineffectiveness in omitting the argument, his motion would be arguing claims he forfeited on direct appeal and his arguments would therefore be barred by procedural default. *See, e.g., id.* The Court therefore considers Lin's entire petition within the rubric of ineffective assistance of counsel.

#### A. Lin's counsel reasonably omitted any self-defense argument regarding the attempted murder of Jackie.

Lin contends that his attorney was ineffective for "fail[ing] to raise [a] self-defense argument" as a defense to the shooting of Jackie. (Mot. at 4; *see also id.* at 26-29.) Yet neither the trial record nor Lin's motion provides reason to believe that Lin acted in self-defense when he and Ah Bo hunted Jackie down with handguns. The failure to raise this argument, therefore, did not render Lin's counsel constitutionally ineffective.

The law recognizes a "right of homicidal self-defense," *United States v. Thomas*, 34 F.3d 44, 48 (2d Cir. 1994), which is limited to a situation in which a person "reasonably believes that he is in immediate danger of death or grievous bodily harm from his assailant," *Brown v. United States*, 256 U.S. 335, 343 (1921). The "immediate danger" is considered to be "dispelled" by intervening events, such as when the assailant leaves the scene. *United States v. White*, 552 F.3d 240, 247-48 (2d Cir. 2009). The doctrine is further limited by "the law in this circuit that 'an aggressor in a conflict resulting in death may not claim self-defense.'" *United States v. Desinor*, 525 F.3d 193, 198 (2d Cir. 2008) (quoting *DeLuca v. Lord*, 77 F.3d 578, 586 (2d Cir. 1996)); *cf. id.* (noting that an initial aggressor who withdraws from the encounter regains his right to self-defense).

The trial evidence concerning the attempted murder of Jackie depicted Lin as the aggressor. Lin's confession, as related to the jury by an FBI agent, told of Lin and Ah Bo searching for Jackie, finding him at a Chinatown restaurant, and awaiting his exit from the restaurant. (Wittenberg Tr. 1901-03.) When Jackie exited the restaurant with a knife, Lin and his confederate were already armed, each with a handgun. (*Id.*) The trial record provides no basis for a finding that Lin withdrew, or made any effort to withdraw, from the confrontation he had sought out before bullets flew.

To support his self-defense argument at this stage, Lin indicates that "Lin was aware Jackie's group was still looking for him even after Mr. Lin had been beaten up." (Mot. at 26.) The trial record supports this statement: after an escalating series of altercations between Jackie on one hand and either Lin or Ah Bo on the other, Lin believed "that [] Jackie's group was still looking for them and  . . . that Jackie's group had been armed." (Wittenberg Tr. 1901.)

Nonetheless, the trial record provides no basis for a self-defense argument. The evidence showed, and Lin's motion confirms, that Lin and his associate acquired handguns in order to pursue Jackie and then confronted him, ultimately shooting him. Lin and Ah Bo, having sought Jackie out while armed, were the initial aggressors in their encounter. Accordingly, it was not objectively unreasonable for Lin's counsel to omit Lin's proposed argument that the shooting of Jackie was in self-defense.

### B.  Lin's counsel reasonably omitted affirmative defenses regarding the murder of Xiao.

Lin raises a similar argument with respect to the murder of Xiao. Here, Lin claims that constitutionally effective counsel would have raised three alternative arguments: (1) that Lin acted in self-defense, (2) that the defense of justification (*i.e.*, necessity) applied, and (3) that Lin was merely an accessory after the fact. (Mot. at 7.) The trial record vindicates Lin's

attorney's decision in omitting these arguments, which do not comport with the evidence.

With respect to self-defense, co-conspirators' testimony at trial revealed that Lin was among the initial aggressors, having entered Xiao's bedroom at night while Xiao was sleeping and while the others in Lin's gang who were present in that bedroom were armed. (*See,* Liu Tr. 494-514; Liu Tr. 1722-23.) Moreover, one of the gang members testified that while Xiao was on the ground, bleeding from stab wounds and coughing up blood, Lin repeatedly kicked him. (Liu Tr. 512-13.) Given the lack of danger to Lin when he orchestrated and carried out the attack on Xiao, Lin's attorney performed reasonably in omitting a self-defense argument.

Lin's claim that his attorney should have made out a justification defense fails for similar reasons. A justification defense applies only in rare circumstances, *see White*, 552 F.3d at 247, and it does not apply if "the defendant was [] reckless or negligent in bringing about the situation that he says required him to commit the offense." *United States v. Smith*, 160 F.3d 117, 123 n.3 (2d Cir. 1998). If Lin was required to participate in the murder of Xiao, then the evidence at trial strongly suggests the violent scenario in which he found himself was of his own making. Thus, it was not unreasonable for his attorney to forego a justification defense at trial and on appeal.

If not justified, Lin argues in the alternative, his role in the Xiao murder represented merely that of an accessory after the fact. (Mot. at 7.) Contemplating a prosecution whose evidence showed that Lin coordinated the assault on Xiao and repeatedly kicked Xiao in the moments before Xiao's death, Lin's counsel did not perform unreasonably by not introducing the concept of an accessory after the fact.

In light of the detailed trial testimony describing Lin's elevated role as a leader and batterer in the Xiao murder, Lin was not deprived of the effective assistance of counsel when his lawyer failed to make the arguments Lin now advances.

## C. Lin's counsel argued at trial that Lin withdrew from the conspiracy, and he reasonably omitted that argument on appeal.

Lin next argues that he "withdrew from [the] New York conspiracy and moved to California," and that his trial counsel was ineffective for failing to argue this fact. (Mot. at 5, *see also id.* at 25-26, 34-36.)

Any argument separating Lin's California conduct from the enterprise that originally took hold in New York would have faced an uphill battle. The trial evidence connected Lin's activities after his move to California with his enterprise in New York in several ways: first, his organization in California began when he reconnected with his fellow New York gang members who had already moved to California (Liu Tr. 406; Yu Tr. 1531-48); and second, he remained in close contact with his New York-based colleagues after establishing a California-based locus (Liu Tr. 160, 171, 407; Li Tr. 1291-92).

Given the evidence linking Lin's California conduct to the same enterprise he had helped lead in New York, it would not have been unreasonable for Lin's counsel to omit this argument at trial and on appeal.

Even so, Lin's trial counsel did make this argument, urging in summation as follows:

> They went out to California and they work at the gambling parlor. That doesn't mean it's the same conspiracy, it's the same enterprise. . . . [W]e submit [it] is not part of the alleged enterprise. And you may decide, well . . . there's a second enterprise. . . . If it's a separate enterprise, then it's not the enterprise charged in this case.
>
> . . .
>
>    If you were to conclude that the enterprise, that he withdrew from it in 2002 . . . or late December of 2001 . . . , that would be the end. . . . So your inquiry goes beyond the "did he do it," to "is it part of the enterprise."

(Tr. 2254-58.) Thus, Lin's counsel did argue to the jury that Lin had withdrawn from the New York conspiracy. Once the jury rejected that argument, appellate counsel was not required to argue that there was insufficient evidence for the jury's finding. After all, given the trial evidence cited above and the "rigorous requirements" involved in a defendant's burden to prove withdrawal from a conspiracy, *see United States v. Borelli*, 336 F.2d 376, 388 (2d Cir. 1964), there was not a reasonable probability that such an argument would have been successful on appeal.

### D. Lin's ancillary arguments do not demonstrate the ineffectiveness of his counsel.

Although Lin's motion enumerates the three reasons he believes that his counsel was constitutionally ineffective, his supporting memorandum alludes briefly to many more alleged deficiencies. Because Lin is proceeding on this motion pro se, this Court construes his papers "liberally and interpret[s] them to raise the strongest arguments they suggest." *McPherson v. Coombe*, 174 F.3d 276, 280 (2d Cir. 1999). Therefore, although Lin's motion does not highlight these arguments as independent grounds for collateral relief, the Court addresses Lin's further substantive attacks.

#### 1. *The attempted murder of Jackie as merely a "personal beef"*

Lin argues that the attempted murder of Jackie was unrelated to the racketeering enterprise with which he was charged. (Mot. at 27.) He insists that the "shooting of rival gang leader Jackie at Duck Egg [C]how restaurant . . . was a personal beef" and had "nothing to do with [the charged] conspiracy." (*Id.*) The very fact that Lin refers to his victim as "rival gang leader Jackie" (*id.*) undercuts his attempt to separate the shooting from the enterprise. The evidence at trial makes this attempt even more frivolous. Specifically, the jury heard evidence that the ultimate leader of Lin's gang provided the handguns for the shooting, that Lin was

required to return the handguns to the gang leader after the shooting, and most directly that the gang leader "had ordered [Lin] and Ah Bo to confront Jackie and recapture their face." (Wittenberg Tr. 1900-02.) In light of this evidence directly connecting the shooting to the criminal enterprise, Lin's attorney did not perform unreasonably in omitting Lin's meritless argument that the shooting was unrelated to the enterprise.

### 2. *The murder of Xiao as merely a "personal beef"*

Lin makes a similar argument regarding the murder of Xiao, stating that this too was the product of a "personal beef." (*See* Mot. at 23.) Lin's attorney made the same argument when seeking to exclude evidence of the Xiao murder. (*See* Def.'s *In Limine* Mots. Based on 3500 Material, Dkt. No. 89, at 3.) After the evidence at trial made it clear that there was a strong connection between the murder and the charged enterprise, Lin's counsel (quite reasonably) changed his strategy on direct appeal, relying on different arguments with respect to the Xiao murder. *See* Brief for Defendant-Appellant, *United States v. Lin*, 505 F. App'x 10 (2d Cir. 2012) (No. 11-5366-cr), 2012 WL 1388192, at *21-25.

The trial record portrays Lin and his fellow gang members undertaking the murder together, partly motivated by Xiao's unpaid debt from an insurance fraud perpetrated jointly by Xiao and a follower of Lin. (*See, e.g.*, Liu Tr. 492-512; Liu Tr. 1707-08.) Lin's attorney was confronted with evidence that closely linked the murder to the gang—by membership and by financial motivation—so the prevailing standards of the profession did not require him to argue on appeal that the murder was unrelated to the enterprise.

### 3. *Prejudice due to the use of the term "Dai Lo"*

Substantial evidence and argument at Lin's trial involved his role as a "Dai Lo" in his gang, and Lin now claims that the term was so inflammatory that his attorney was ineffective for not objecting to its use. (*See* Mot. at 20-22.) The term is not some inflammatory nickname: it is,

according to the trial record, a title that reflects Lin's role in the racketeering enterprise.

Several witnesses at trial either referred to him or testified to having earlier referred to him as "Dai Lo." (*See, e.g.*, Liu Tr. 800; Huang Tr. 954; Li Tr. 1216, 1218.) The witnesses defined the term as indicating a "boss" (Liu Tr. 119), or, "in a gang[,] a big brother" who "is a guy to respect, to be respected. You know you listen to what he say[s]" (Yee Tr. 840-42). The soldiers in a gang are "to do what the Dai Lo say[s]." (*Id.* at 842.) The government drew attention in both its opening and its summation to evidence that Lin was a Dai Lo. (Tr. 90 (opening), 2100 (summation).) Lin's counsel attempted to show at trial that the term was not a gang-specific label but rather a common fraternal moniker in Lin's community. (*See, e.g.*, Liu Tr. 706.)

In support of his argument, Lin cites *United States v. Farmer*, 583 F.3d 131 (2d Cir. 2009), in which the Second Circuit vacated a conviction due to the government's repeated use of the defendant's nickname "Murder," which was "an appellation that . . . had little, if any relevance to any contested issue." *Id.* Unlike the incendiary nickname in *Farmer* that was decidedly irrelevant, the title "Dai Lo" was relevant proof of Lin's role in the ongoing enterprise. As for the risk of undue prejudice, a title that means "boss" is not viscerally inflammatory in a racketeering trial, and it is manifestly more innocuous than the nickname "Murder" in a murder trial.

### 4. *Other putative grounds for relief*

Lin recites several other arguments—for example, that Lin's financial difficulties meant he could not possibly have been a gang leader (*see* Mot. at 22); that the Second Amendment to the U.S. Constitution protected his conduct in bearing arms against Jackie (*see id.* at 30); and that evidence of injuries to a two-year-old bystander during the assault on Jackie was unduly prejudicial (*see id.* at 29-30). The Court has considered each of Lin's arguments and concludes that they lack merit.

## IV. CONCLUSION

Guang Ju Lin's conviction, sentence, and appeal followed a fair trial in which he was represented by experienced and competent counsel. The trial and appellate process vindicated Lin's constitutional rights, including his Sixth Amendment right to the effective assistance of counsel. The sentence he now serves is consistent with his crimes and with the Constitution and laws of the United States.

Accordingly, the Court denies Lin's motion pursuant to 28 U.S.C. § 2255. As the motion makes no substantial showing of a denial of a constitutional right, a certificate of appealability will not issue. *See* 28 U.S.C. § 2253(c)(2). The Court certifies, pursuant to 28 U.S.C. § 1915(a)(3), that any appeal from this order would not be taken in good faith and therefore *in forma pauperis* status is denied for the purpose of an appeal. *See Coppedge v. United States*, 369 U.S. 438, 444-45 (1962); *Batista v. United States*, No. 12 Civ. 8661, 2012 WL 6604585, at *2 (S.D.N.Y. Dec. 17, 2012).

Dated:  New York, New York
        June 18, 2014

SO ORDERED:

Sidney H. Stein, U.S.D.J.